UNITED STATES BANKRUTPCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>HANK FATOOREHCHI,<br><br>Debtor.<br><br>BARRY A. CHATZ, not individually but solely as Chapter 7 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>ARAM STEPANIANTS d/b/a ASTRA COMPUTERS,<br><br>Defendant. | Case No. 13 B 46203<br><br>Chapter 7<br><br>Adv. No. 14 A 679<br><br>Judge Pamela S. Hollis |

## MEMORANDUM OPINION

This matter comes before the court following trial on the complaint brought by Barry A. Chatz as Chapter 7 Trustee. Chatz seeks avoidance and recovery of certain transfers to Defendant Aram Stepaniants. Having heard the testimony of witnesses and reviewed the exhibits and papers submitted by the parties, for the reasons stated below the court will enter judgment for Stepaniants on all counts.

## JURISDICTION

Under 28 U.S.C. § 1334, district courts have original and exclusive jurisdiction of all cases under Title 11. The underlying bankruptcy case was automatically referred to this court pursuant to Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois, as authorized by 28 U.S.C. § 157(a).

This adversary proceeding, filed within the bankruptcy case, contains four counts sounding in federal and state fraudulent transfer law. This court has the statutory authority to enter final judgment on a complaint to avoid fraudulent transfers. 11 U.S.C. §§ 548, 544.

Prior to the Supreme Court's decision last June in Wellness Int'l Network, Ltd. v. Sharif, ___ U.S. ___, 135 S. Ct. 1932, 1939 (2015), there were questions regarding this court's constitutional authority to enter a final judgment on a fraudulent transfer claim, including whether parties could consent to a final judgment by a bankruptcy judge. In Executive Benefits Ins. Agency v. Arkison, ___ U.S. ___, 134 S. Ct. 2165, 2172, 2174 (2014), the Supreme Court assumed without deciding that "fraudulent conveyance claims . . . are Stern claims[1] – that is, proceedings that are defined as 'core' under § 157(b) but may not, as a constitutional matter, be adjudicated as such . . .". The Executive Benefits Court determined that bankruptcy courts may make proposed findings of fact and conclusions of law as to Stern claims. Id. at 2173. It did not determine whether this court could constitutionally enter a final judgment on such a claim, or whether the parties could consent to one.[2]

The Court resolved those issues last year in Wellness, which put to rest the question of this court's constitutional authority to enter a final judgment on fraudulent transfer claims, at least under certain circumstances. "Article III is not violated when the parties knowingly and voluntarily consent to adjudication by a bankruptcy judge." Wellness, 135 S. Ct. at 1939.

---

[1] Stern v. Marshall, ___ U.S. ___, 131 S. Ct. 2594 (2011).
[2] If Stepaniants had filed a proof of claim, resolution of the fraudulent transfer issues would have been essential to the process of ruling on that proof of claim, and constitutional authority to enter a final judgment would not have been in question. Peterson v. Somers Dublin Ltd., et al., 729 F. 3rd 741, 747 (7th Cir. 2013) ("The Supreme Court held in Katchen v. Landy, 382 U.S. 323, 329–36, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966), and Langenkamp v. Culp, 498 U.S. 42, 44–45, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990), that Article III authorizes bankruptcy judges to handle avoidance actions against claimants. See also Granfinanciera S.A. v. Nordberg, 492 U.S. 33, 57–59, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989). Stern stated that its outcome is consistent with those decisions. 131 S.Ct. at 2616–18.").

2

In this proceeding, the parties knowingly and voluntarily consented to adjudication by this court. The Trustee alleged in his complaint and Stepaniants admitted in his answer that this court has jurisdiction over this proceeding. Complaint and Answer, ¶ 2. They also alleged and admitted that this proceeding is a core matter, and Stepaniants did not demand a trial by jury. The parties appeared before the court through counsel on numerous occasions (and Stepaniants appeared in person, as a witness at trial), and neither one ever suggested that they sought anything other than a final judgment, or that they did not consent to adjudication in this court.

Even if Stepaniants' consent was implicit, "implied consent is good enough." Richer v. Morehead, 798 F.3d 487, 490 (7th Cir. 2015). Although Stepaniants is not a "sophisticated businessman" as the parties were in Richer, he is represented by competent counsel who is experienced in bankruptcy practice. "Alternatively (and equivalently) the parties forfeited any objection to the bankruptcy court's adjudication of the ... claim by failing to object at any point during the litigation to the bankruptcy judge's adjudicating the claim." Id.

For all of the reasons stated above, this court has the constitutional authority to enter a final judgment on this complaint.

Venue is proper in this court pursuant to 28 U.S.C. § 1409(a).

## FINDINGS OF FACT

Hank Fatoorehchi Founds and Aram Stepaniants Joins First Class Realty

Debtor Hank Fatoorehchi got his real estate license in 1985, his broker's license in 1989, and eventually a managing broker's license, after which he established First Class Realty, Inc. in 1996. Tr. at 52-53.

First Class Realty's business began slipping in the second half of 2005. Fatoorehchi decided "to sell part of the office so that I can have money to keep the office running." Tr. at 56,

lines 20-21. Although Fatoorehchi never advertised that the business was for sale, he had been thinking about doing so – "[j]ust about everybody knew in the office." Tr. at 57, line 17.

In fact, his employees' knowledge of his desire to sell the business was how Aram Stepaniants first came to Fatoorehchi's attention. "[H]is wife, who was an agent in the office, approached me and said, If you're looking to sell part of your business, my husband is looking to invest money." Tr. at 57, lines 20-23.

Meanwhile, Stepaniants did some research to determine whether it would be lucrative to invest with Fatoorehchi, "[a]nd then I thought that this [Fatoorehchi's business] was interesting." Tr. at 70, lines 7-8.

In 2007, Stepaniants bought 49 percent of First Class Realty for $350,000. Tr. at 22-23. Since he did not hold a broker's license, Stepaniants could not own 50% or more of the company. Tr. at 54. He and Fatoorehchi executed an employment agreement providing a $48,000 salary to Fatoorehchi as compensation for serving as manager of the office. Def. Ex. 3.

Stepaniants brought two things to First Class Realty: $350,000, and information technology expertise. The expertise was not gained through formal education – although Stepaniants has two master's degrees, neither is related to computer science. Instead, "I started doing that when I was 14, and it was always my best thing. I had – like continuous education all the time, but not – mostly self-education." Tr. at 68, lines 3-6.

After the sale, Fatoorehchi's "responsibility was to manage and run the office, and [Stepaniants'] responsibility was to take care of the equipment and computers in the office." Tr. at 55, lines 12-14.

Stepaniants took over all of First Class Realty's information technology business:

At First Class there was – it was a complicated system. There was a server, like local server, about 55 clients. So I did basically everything – service,

4

maintenance, network administration, server administration, administrating e-mails. Basically that's – replacing computers.

Tr. at 72, lines 20-25.

Before Stepaniants joined him, Fatoorehchi had been paying a third party about $2,500 per month for IT services. Tr. at 72.

First Class Realty and Century 21 AAA Homes Form a New Company, HKC

Despite the cash infusion from Stepaniants, First Class Realty continued to struggle due to "the bad economy in 2008 which really hit the office in 2006. Real estate was bad." Tr. at 23, lines 13-15. In 2009, Fatoorehchi joined forces with Carolyn Mellander and Kim Thompson, owners of Century 21 AAA Homes.

For the first two years, the companies shared space and expenses, but kept their income separate. After that, explained Fatoorehchi, "[i]nstead of doing it that way sharing expenses, let's merge each other and become one." Tr. at 59, lines 4-5. The new company was incorporated as HKC, Inc., doing business as Century 21 First Class Homes ("HKC"). Tr. at 8.

Mellander, Thompson and Fatoorehchi each owned one-third of HKC. Tr. at 9.

Stepaniants had no ownership interest in HKC, but Fatoorehchi understood that when First Class Realty closed, "there is no more obligation that I have to – [b]ut we talked about this, and we had an agreement and we're two gentlemen, we said everything we do in regards to HKC, we are still partners." Tr. at 60, lines 12-16.

Stepaniants and Fatoorehchi Agree to Share Fatoorehchi's Interest in HKC

In April 2011, Fatoorehchi and Stepaniants signed an agreement to memorialize their understanding that they were still partners. Def. Ex. 2 (the "April 2011 Agreement"). Fatoorehchi considered the arrangement to be a continuation of the partnership originally formed under First Class Realty. Tr. at 61. "The first 35,000 I would get for managing the office, and

5

anything after that was split 50/50." Tr. at 61, lines 14-15. Stepaniants agreed that the written agreement formalized their verbal understanding. Tr. at 77.

In its entirety, the April 2011 Agreement states as follows:

This agreement by and between Hank Fatoorehchi, owner/shareholder of HKC, Inc. D/B/A Century 21 1st Class Homes, and Aram Stepaniants, dated this 23rd day of April, 2011.

1. Hank Fatoorehchi, Carol Mellander, and Kimberly Thompson each own a 1/3 interest in HKC, Inc. D/B/A Century 21 1st Class Homes.
2. Aram Stepaniants has contributed capital and services to Hank Fatoorehchi with regards to HKC, Inc. D/B/A Century 21 1st Class Homes.
3. Hank Fatoorehchi and Aram Stepaniants shall each have a 50% equitable interest in Hank Fatoorehchi's shares of HKC, Inc. D/B/A Century 21 1st Class Homes.
4. Hank Fatoorehchi shall be paid $34,000 per year for management services related to HKC, Inc. D/B/A Century 21 1st Class Homes.
5. Hank Fatoorehchi and Aram Stepaniants shall share all profits and all losses equally with regard to Hank Fatoorehchi's interest in HKC, Inc. D/B/A Century 21 1st Class Homes.
6. In the event of the death of Hank Fatoorehchi, Aram Stepaniants shall have 50% claim on the shares of HKC, Inc. D/B/A Century 21 1st Class Homes.
7. This agreement shall remain in full force and effect as long as HKC, Inc. D/B/A Century 21 1st Class Homes remains an active corporation.

The April 2011 Agreement is signed by each of the parties, although it is not notarized. Def. Ex. 2. Stepaniants earned nothing in 2009 or 2010 from this interest in Fatoorehchi's shares. Tr. at 62-63.

Aside from the April 2011 Agreement, under which he would be entitled to share in the profits from Fatoorehchi's interest in HKC, Stepaniants received nothing for his $350,000 investment when First Class Realty closed.

Stepaniants Provides Information Technology Services to HKC

According to Mellander, Stepaniants "has always been the IT person in my company who has done much work on computers and installing new computers and printers and fixing everything along those lines that got broken . . . . Anything to do with computers, printers,

6

toners, inks, the IT equipment in our company, he has always been there to install and fix." Tr. at 9, lines 15-22.

Mellander also testified that Stepaniants and his company, Astra International Services, submitted invoices to HKC for "[a]ny and all work on the equipment in the office, which also included almost every agent in the office every time their computer broke down or they needed something installed. So he serviced a lot of people." Tr. at 10, lines 18-22.

All of the invoices that Astra submitted to HKC were for equipment and supplies. Stepaniants never charged for labor. According to Fatoorehchi, "[t]hat was part of our agreement for him to do the computer work in the office and not get paid." Tr. at 64, lines 10-11.

Furthermore, Fatoorehchi understood that when Stepaniants invoiced HKC for items it had purchased, such as computers and toners, he did not mark them up. Tr. at 63. "I know that for certain because sometimes he did not even charge us for the tax on the items because his company doesn't pay taxes." Id., lines 21-23. The reason Stepaniants did not mark anything up? "He was part of the corporation." Tr. at 64, line 1.

HKC Makes Payments to Stepaniants

Although Mellander and Thompson shared the management responsibilities at HKC, Mellander wrote the vast majority of the checks for HKC's shareholder distributions. Tr. at 13. There was no set amount for distribution to the shareholders, but "every other week if there's enough money there left to actually pay all of our bills, I will write a paycheck to Hank, Kim, and myself [for equal amounts]." Tr. at 13, lines 5-8. See Pl. Ex. 8. Up until mid-2013, the three co-owners did not consistently receive a paycheck. The real estate market improved in the past two years. Tr. at 13-14.

7

After First Class Realty and Century 21 AAA Homes formally merged, HKC occasionally issued checks to Stepaniants' company, Astra, that were based on Fatoorehchi's shareholder distributions. As Mellander explained:

> When we first merged with -- or when Hank first merged in with us, he indicated that he, in my memory, owed Aram a lot of money because he had borrowed a lot of money to try to keep his other company open, and that there would be times that he -- his paycheck [shareholder distribution] would go to Aram for that reason, or maybe even some commission checks. And I remember Kim and I saying, That's fine if you owe him money, but he doesn't have any ownership in HKC. And that's how it was left.

Tr. at 12, lines 5-14.

Fatoorehchi did not regularly ask that his checks be paid to Stepaniants, but "[o]nce in a while he would come in if I [Mellander] were doing paychecks and would say, You know, remember, I owe Aram money. Instead of cutting this paycheck to me, can you cut it to Astra." Tr. at 14, lines 21-24.

Mellander never wrote a check to Stepaniants, only to his company, Astra. Tr. at 19. Stepaniants asked that the payments be made to Astra rather than to himself individually. Tr. at 28.

HKC's accountant issued 1099s to Astra. In 2012, HKC paid Astra $33,404.55. Pl. Ex. 3, 4. Of that amount, $29,000 was Fatoorehchi's shareholder distributions.

In 2013, HKC paid Astra $34,414.24. Pl. Ex. 6, 7. Of that amount, $19,520 was Fatoorehchi's shareholder distributions. Tr. at 29.

The parties stipulated that the amount transferred to Stepaniants during the two years prior to Fatoorehchi's bankruptcy case which was attributable to paychecks or shareholder distributions was $48,520. Tr. at 48. After Fatoorehchi received $35,000 for the year, "the checks that would come in I would take one and then the next one would go to Aram on any given day." Tr. at 46, lines 15-17.

8

HKC also paid Astra $11,383.32 for which invoices were produced. The parties stipulated that Astra received $7,915.47 that was not attributable to shareholder distributions and for which no invoices were produced. Tr. at 48.

If any of the co-owners personally represented a buyer or seller, they received a commission check that would not be shared with the business or the other owners. Tr. at 14. Fatoorehchi never directed any of his commission checks to be paid to Stepaniants. Tr. at 45.

Fatoorehchi filed for relief under Chapter 7 of the Bankruptcy Code on November 20, 2013. He had stopped paying his creditors around 2009, when Itasca Bank increased his monthly loan payments from $5,500 to $8,000. "I couldn't pay it anymore, which was in 2009 I believe." Tr. at 31, 32 lines 1-2.

## CONCLUSIONS OF LAW

**Count I**

Pursuant to 11 U.S.C. § 548(a)(1)(B), the Trustee seeks to avoid the transfer of $56,435.47 to Stepaniants (through Astra) during the two years prior to Fatoorehchi's bankruptcy case.

> (a) (1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> . . .
>
> (B)  (i)  received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

9

11 U.S.C. § 548(a)(1)(B). This cause of action is often described as "constructive fraud" because no element of intent is required. Matter of FBN Food Services, Inc., 82 F. 3rd 1387, 1394 (7th Cir. 1996).

Of the transfers the Trustee seeks to avoid, $48,520 was attributable to paychecks or shareholder distributions. No invoices were produced to support the transfer of the remaining $7,915.47.

In order to prevail on this count, the Trustee must prove the following elements: (1) there was a transfer of Fatoorehchi's property or an interest therein; (2) made within two years of the filing of his bankruptcy petition; (3) for which Fatoorehchi received less than a reasonably equivalent value in exchange; and (4) Fatoorehchi was insolvent or was rendered insolvent as a result of the transfer. See Freeland v. Enodis Corp., 540 F. 3rd 721, 737 (7th Cir. 2008) (BAPCPA changed the lookback period from one to two years).

The Trustee must prove each element by a preponderance of the evidence. Baldi v. Lynch (In re McCook Metals, LLC), 319 B.R. 570, 587 (Bankr. N.D. Ill. 2005). Once the Trustee has established these elements, the burden shifts to Stepaniants to demonstrate that adequate consideration was given for the transfers.

Stepaniants does not dispute that there were transfers of Fatoorehchi's shareholder distributions in the amount of $48,520.[3] The parties also stipulated that the amount transferred

---

[3] Despite the parties' agreement, the court questions whether the first element is satisfied – that is, whether there was a transfer of an interest of the debtor in property – as to the shareholder distributions. The Bankruptcy Code does not define "an interest of the debtor in property," but "guidance is available from judicial interpretation of the related phrase 'property of the estate.'" McCloskey v. Wells Fargo Bank Wisconsin, NA (In re Art Unlimited, LLC), 2007 WL 2670307, *8 (E.D. Wis. Sept. 6, 2007). Using the Supreme Court's interpretation of 11 U.S.C. § 541, the Art Unlimited court concluded that "interest of the debtor in property" is "best understood . . . as that property that would have been part of the estate had it not been transferred before the commencement of the bankruptcy proceedings." Id. (quotation omitted).

Would the $48,520 that was attributable to shareholder distributions have been part of Fatoorehchi's bankruptcy estate if it had not been transferred to Stepaniants? According to the April 2011 Agreement, after Fatoorehchi received $34,000, Stepaniants and Fatoorehchi were to share all profits and losses equally with regard

10

for which there were no supporting invoices was $7,915.47. Furthermore, "[n]o party disputes that the transfers occurred within two years of the filing of the bankruptcy petition." Defendant's Post-Trial Brief at 5. The parties focus their arguments on the questions of reasonably equivalent value and insolvency.

It is the Trustee's burden to prove that less than reasonably equivalent value was provided. The test for determining whether reasonably equivalent value was given requires courts to "determine the value of what was transferred and to compare it to what was received." Barber v. Golden Seed Co., Inc., 129 F. 3rd 382, 387 (7th Cir. 1997) (citation omitted).

This is not a fixed mathematical formula. See id. Instead, the factors a court may consider include "the fair market value of what was transferred and received, whether the transaction took place at arm's length, and the good faith of the transferee." Smith v. SIPI, LLC and Midwest Capital Investments, LLC (In re Smith), 811 F. 3rd 228, 240 (7th Cir. 2016) (citations omitted).

Stepaniants argued that reasonably equivalent value was represented by the IT services he provided. The testimony adduced at trial supports his argument.

The witnesses testified that Stepaniants provided a significant amount of information technology services, without ever charging for his labor. At First Class Realty, where he had also been responsible for the IT business, Stepaniants "did basically everything – service, maintenance, network administration, server administration, administrating e-mails. Basically

---

to Fatoorehchi's interest in HKC. The transfers of $48,520 represented Stepaniants' share of profits, and it can be argued that these funds never belonged to Fatoorehchi and would not have been property of the bankruptcy estate. See, e.g., In re Abbale, 475 B.R. 334, 341 (Bankr. E.D.N.Y. 2012) (holders of an economic interest in certain of debtor's LLC shares were entitled to receive distributions of profits with respect to those shares, and such "unpaid distributions, if any, would not be property of the bankruptcy estate.").

    Since the court determined that the Trustee failed to prove a lack of reasonably equivalent value as well as insolvency, it is unnecessary to disturb the parties' agreement that there were transfers of an interest of the debtor in property, but the uncertainty surrounding this element provides further support for the court's ultimate conclusion that the transfers were not fraudulent.

11

that's – replacing computers." Mellander, a credible and objective witness, testified that at HKC Stepaniants "has always been the IT person in my company who has done much work on computers and installing new computers and printers and fixing everything along those lines that got broken . . . . Anything to do with computers, printers, toners, inks, the IT equipment in our company, he has always been there to install and fix." Furthermore, she stated that Stepaniants did "[a]ny and all work on the equipment in the office, which also included almost every agent in the office every time their computer broke down or they needed something installed. So he serviced a lot of people."

Fatoorehchi testified that Stepaniants never charged for labor because "[t]hat was part of our agreement for him to do the computer work in the office and not get paid." He also testified that Stepaniants did not mark up the equipment and supplies he purchased for HKC.

There is no documentary evidence, such as contemporary time records, to indicate whether the hours worked would have been worth approximately $50,000 over two years. But we know that before Stepaniants joined First Class Realty, Fatoorehchi had been paying a third party about $2,500 per month for the same IT services.

In other words, Stepaniants' IT work was worth about $2,500 per month, or $30,000 per year, at First Class Realty. How much more were those services worth after First Class Realty combined with Century 21 AAA Homes? Moreover, Stepaniants received no distributions in 2009 and 2010, although he continued to provide those IT services. Even if the value of his services remained unchanged at $30,000 per year, Stepaniants provided $150,000 of value over 5 years (2009 through 2013) and received $48,520 in shareholder distributions and an additional $7,915.47.

12

It was the Trustee's burden to show that the value provided, as evidenced by the consistent and credible testimony received at trial, was less than reasonably equivalent to the amount transferred. The Trustee did not meet this burden.

Smith tells us to consider the fair market value of what was transferred and received, whether the transaction took place at arm's length, and the good faith of the transferee. 811 F.3rd at 240. We do not know the exact fair market value of what was transferred. But this lack of information cannot cut against Stepaniants, who does not bear the burden of proof. It is the Trustee's burden to demonstrate less than a reasonably equivalent value. While the transactions were not at arms' length – the parties had been doing business together for years – there was nothing in the arrangement that appeared suspicious or would lead the court to question Stepaniants' good faith. There was no evidence that Fatoorehchi and Stepaniants had anything other than a respectful business relationship. Having had the opportunity to observe the witnesses, their demeanor, and their tone, the court finds that all parties truly believed that the provision of Stepaniants' IT services was a fair exchange for a share of Fatoorehchi's shareholder distributions.[4]

---

[4] Alternatively, the court might ask whether the transfers deprived Fatoorehchi's unsecured creditors of funds that would otherwise have been available to them. "[T]he proper focus is on the net effect of the transfers on the debtor's estate, the funds available to the unsecured creditors. As long as the unsecured creditors are no worse off because the debtor, and consequently the estate, has received an amount reasonably equivalent to what it paid, no fraudulent transfer has occurred." Harman v. First Am. Bank of Maryland (In re Jeffrey Bigelow Design Grp., Inc.), 956 F.2nd 479, 484 (4th Cir.1992). See Leibowitz v. Parkway Bank & Trust Co., 210 B.R. 298, 301 (N.D.Ill.1997) ("If Debtor's unsecured creditors were (or are) damaged in their ability to collect from Debtor by virtue of Debtor's transfers to Parkway, then the Transfers were (and are) fraudulent and may be avoided by the Trustee.") aff'd sub nom. In re Image Worldwide, Ltd., 139 F.3rd 574 (7th Cir.1998).

In this case, even putting aside the evidence of Stepaniants' free labor, one could argue that Fatoorehchi's unsecured creditors received reasonably equivalent value because the funds transferred to Stepaniants were never available to them. Under the April 2011 Agreement, Fatoorehchi and Stepaniants agreed to share in the profits attributable to Fatoorehchi's interest as a shareholder in HKC. Therefore, 50% of Fatoorehchi's profits, after his $34,000 "salary", belonged to Stepaniants, by virtue of the 2011 Agreement. The transfers consisted of funds that never could have belonged to the unsecured creditors.

13

The Trustee argues that any value Stepaniants provided was a benefit only to HKC, and not to Fatoorehchi. Although this is technically accurate, the reality is that Fatoorehchi was a one-third shareholder in HKC, a corporation with only three shareholders. Anything that increased HKC's bottom line by reducing its expenses redounded to Fatoorehchi's benefit by increasing his profits. Mellander testified that distributions were made to the shareholders when funds remained after paying all expenses. Since HKC did not pay for the expense of Stepaniants' labor, or for any mark up on the equipment and supplies he ordered, its own profits were commensurately increased, and thus its shareholders' profits were increased as well.

As mentioned above, Stepaniants provided free labor beginning in 2009, when First Class Realty and Century 21 AAA Homes first combined operations. But he received nothing on account of his interest in Fatoorehchi's shares in 2009 or 2010. Whether HKC broke even or suffered losses in 2009 and 2010, it would have had an even worse bottom line if it had to pay an outside vendor (such as the one Fatoorehchi paid $2,500 per month prior to 2007) to provide information technology services. So HKC – and through the corporation, its one-third shareholder Hank Fatoorehchi – received the benefit of Stepaniants' services and his failure to mark up purchased items for years before any transfers were made.

Finally, recall that in 2007 Stepaniants brought two positive attributes with him to First Class Realty – his information technology expertise, and $350,000. Fatoorehchi received a cash infusion of $350,000 in return for approximately half his company. But when Fatoorehchi dissolved the company and formed HKC, Stepaniants received nothing for his 49% interest in First Class Realty except the side agreement to hold an equitable interest in Fatoorehchi's shares. The Trustee argued that "the Debtor never received any consideration in exchange for transferring an equitable interest in HKC to the Defendant." Plaintiff's Trial Brief at 11. But

Stepaniants had already paid Fatoorehchi $350,000, just four years earlier, and during those four years he provided IT services on top of that large capital contribution. The issue at hand is whether Stepaniants provided reasonably equivalent value to Fatoorehchi, and the $350,000 paid in 2007 cannot be ignored when considering the entire context of these transactions.

Having considered the value of what was transferred and compared it to what was received, whether the transaction took place at arm's length, and the good faith of the transferee, the court concludes that the Trustee has not proved by a preponderance of the evidence that less than a reasonably equivalent value was received from Stepaniants in exchange for the transfers.

Having found that the Trustee failed to meet his burden with regard to reasonably equivalent value, it is unnecessary to consider whether Fatoorehchi was insolvent when the transfers were made. Nevertheless, as discussed below, the Trustee failed to meet his burden of proof on the issue of insolvency. This result provides further support for the court's conclusion that these transfers were not fraudulent.

According to the Bankruptcy Code, an entity (other than a partnership and a municipality) is insolvent when "the sum of such entity's debts is greater than all of such entity's property." 11 U.S.C. § 101(32)(A). This is also known as a balance-sheet approach. "In order to determine solvency on a balance-sheet basis, a snapshot must be taken of a debtor's financial situation at the time of the transfer or shortly after the transfer, and the extant liabilities must be subtracted from the existing assets." Grochocinski v. Zeigler (In re Zeigler), 320 B.R. 362, 377 (Bankr. N.D. Ill. 2005).

To prove insolvency, the Trustee focuses on Fatoorehchi's schedules and the amount he owed to his creditors at the time of the bankruptcy filing. Furthermore, according to

Fatoorehchi's Statement of Financial Affairs, nine mortgage foreclosure or collection lawsuits were pending against him during the year prior to filing his bankruptcy case.

But no evidence was submitted to support a finding that the sum of all of these debts was greater than the value of all of Fatoorehchi's property <u>at the time of the transfers</u>, or that any of the transfers rendered Fatoorehchi insolvent. Eight pieces of real property were listed in Fatoorehchi's Schedule A, and he indicated that all but one were quitclaimed to his estranged spouse in 2009. Therefore, he valued them at $0 on Schedule A. As to four of those properties, however, Fatoorehchi noted that he "attempted to assert ownership interest through divorce proceeding and prior Chapter 13 filing." It is entirely unclear what the value of Fatoorehchi's assets was at the time of the transfers.

"A trustee may utilize appropriate means to prove insolvency, including balance sheets, financial statements, appraisals, expert reports, and other affirmative evidence." <u>Grochocinski v. Schlossberg, et al.</u> (In re Eckert), 388 B.R. 813, 833 (Bankr. N.D. Ill. 2008) (citation omitted), aff'd, 402 B.R. 825 (N.D. Ill. 2009).[5] The Trustee used none of these. The court could find no evidence to show that Fatoorehchi's debts were, at the time of the transfers, greater than the value of his property, or that any one of the transfers rendered him insolvent.

Having failed to prove lack of reasonably equivalent value as well as insolvency, the Trustee has not satisfied all of the elements required to prevail under 11 U.S.C. § 548. Judgment will be entered for Stepaniants on Count I.

**Count II**

In Count II, the Trustee seeks to recover the value of the transfers at issue in Count I pursuant to 11 U.S.C. § 550.

---

[5] Eckert was rejected by In re Canopy Financial, Inc., 477 B.R. 696, 708 (N.D. Ill. 2012), but for a different proposition.

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from –
>
>> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>>
>> (2) any immediate or mediate transferee of such initial transferee.

Since no transfers were avoided in Count I, no analysis is required under 11 U.S.C. § 550. Judgment will be entered for Stepaniants on Count II.

**Count III**

The Trustee seeks to avoid the same transfers as in Count I pursuant to 11 U.S.C. § 544 and 740 ILCS § 160/5(a)(2), the Illinois Fraudulent Transfer Act.

According to § 544(b), a "trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title."

Although the Trustee did not identify a "triggering creditor," it is unnecessary to do so. Fatoorehchi's Schedule F identifies more than ten unsecured creditors, and the Seventh Circuit has indicated that a trustee need not identify the specific creditor who could set aside the transfers. "[A number of] unsecured claims have been filed; the Trustee can assume the position of any one of them." In re Leonard, 125 F. 3rd 543, 544 (7th Cir. 1997).

An unsecured creditor could seek to avoid the transfers under the Illinois Fraudulent Transfer Act, found at 740 ILCS § 160/5(a)(2):

> (a)   A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

17

. . . .

> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
>> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>
>> (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

The elements of a fraudulent transfer pursuant to § 544 and 740 ILCS § 160/5(a)(2) are essentially the same as those required under 11 U.S.C. § 548(a)(1)(B). The Illinois statute is based on the Uniform Fraudulent Transfer Act, which was an effort to harmonize state law with the Bankruptcy Code. See Image Worldwide, 139 F. 3rd at 577.

Therefore, the same conclusions apply to this cause of action – with two exceptions.[6] First, the Illinois law allows a four year lookback period. That difference has no bearing on the court's analysis of these transfers, all of which occurred within two years before Fatoorehchi's bankruptcy filing.

Second, the Illinois Fraudulent Transfer Act uses essentially the same definition of insolvency as does the Bankruptcy Code, that "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." 740 ILCS § 160/3(a).

But the Act also includes a presumption: "A debtor who is generally not paying his debts as they become due is presumed to be insolvent." Id. at § 160/3(b).

Because of this added presumption, for purposes of the Illinois Fraudulent Transfer Act, the Trustee has established a prima facie case that Fatoorehchi was insolvent at the time of the

---

[6] Illinois law also provides that for the purposes of § 160/5(a)(2), "a person gives a reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale or execution of a power of sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust, or security agreement." § 160/4. This definition has no bearing on whether reasonably equivalent value was provided under the circumstances of this case.

transfers. The Trustee elicited testimony at trial that Fatoorehchi's financial troubles began in 2007. This is consistent with his decision to bring Stepaniants in as an investor. By 2009 Fatoorehchi had stopped paying his creditors. Therefore, the presumption arises that, for purposes of the Illinois Fraudulent Transfer Act, Fatoorehchi was insolvent at the time of the transfers.

Stepaniants introduced no evidence to rebut this presumption. As a result, the Trustee satisfied the requirement of proving that Fatoorehchi was insolvent at the time of the transfers. Since he failed to prove lack of reasonably equivalent value, however, he has not satisfied all of the elements required to prevail under 11 U.S.C. § 544 and 740 ILCS § 160/5(a)(2). Judgment will be entered for Stepaniants on Count III.

**Count IV**

In Count IV, the Trustee seeks to recover the transfers at issue in Count III. Pursuant to 740 ILCS §§ 160/8 and 160/9, "once transfers have been deemed fraudulent, the creditor may recover the property transferred or obtain a money judgment for the value of the assets transferred . . ." Central Laborers Pension Fund, et al. v. AEH Construction, Inc., 2015 WL 7293207, *2 (C.D. Ill. Nov. 18, 2015) (quotation omitted).

Since no transfers were avoided in Count III, no analysis is required under 740 ILCS §§ 160/8 and 160/9. Judgment will be entered for Stepaniants on Count IV.

## CONCLUSION

For all of the reasons stated above, the court will enter judgment in favor of Defendant Aram Stepaniants on all counts of the complaint.

Date: 3/9/2016

PAMELA S. HOLLIS
United States Bankruptcy Judge